## Case No. 18,269.

### CHARGE TO GRAND JURY—NEUTRALITY LAWS AND TREASON.

### [2 Curt. 630.]

### Circuit Court, D. Massachusetts. Oct. 15, 1851.

NEUTRALITY LAWS—CONSTRUCTION AND EFFECT—TREASON AGAINST THE UNITED STATES—OPPOSING EXECUTION OF A LAW.

[1. The neutrality law of March 5, 1794 (1 Stat. 381), and the subsequent legislation upon the same subject, rest upon the principle that, until our country has made war, we are at peace with all, by the law of nations, and without any treaty to that effect; and that for the citizens of the United States to combine to kill and rob those with whom they are at peace, and on whom they have no right to make any aggression, is as essentially criminal as to combine to murder and rob our own citizens.]

[2. The duties of impartiality, kindness, and peaceful treatment of other nations, being plainly incumbent on the government of the United States, it is its duty to see that all those subject to its authority do nothing in contravention of these duties. What it may not do in these particulars it may not permit to be done; and, for its own peace and welfare, it cannot suffer individuals, by mingling themselves in the belligerent operations of other nations, or by making war on their own authority, to run the hazard of counteracting the policy, or embroiling the relations of their own government.]

[3. The words "levying war," as used in the constitutional definition of "treason," include not only the act of making war for the purpose of entirely overturning the government, but also any combination forcibly to oppose the execution of any public law of the United States, with intent to prevent its enforcement in all cases, if accompanied or followed by an act of forcible opposition to such law in pursuance of such combination.]

[4. If a body of men be actually assembled to effect by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered guilty of treason.]

Extract from a charge delivered to the grand jury in Boston, October 15, 1851, concerning the neutrality laws and the law of treason:

CURTIS, Circuit Justice (charging grand jury). You are aware that the foreign relations of our country are under the exclusive care and control of the government of the United States. To make peace and war, to enter into treaties of amity and commerce, to protect the rights and redress the injuries of our citizens from foreign aggression, are powers confided by the constitution to the general government alone. It is essential to the due exercise and maintenance of these powers, and to the welfare of the whole people, for whose benefit they exist, that they should not be in any way embarrassed or interfered with, by the irregular and irresponsible action of individuals. The public faith, pledged by treaties, could not be kept, if individual citizens were at liberty to act, in contravention of such treaties, as their private interest or passions might dictate. The public peace could not be preserved, if men might be armed and embodied on our soil, to make attacks on a foreign people or government. To permit this, would be to allow the interests or passions of a few, to control the deliberate and organized action of the whole, and to place the peace and welfare of our country at the mercy of strangers, or of needy, or desperate, or enthusiastic men. To guard against this evil, congress has made it a high misdemeanor, within the jurisdiction or territory of the United States, to begin to set on foot, or provide, or prepare the means for, any military expedition, or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace; and has also made specific, and highly penal enactments, to prevent the enlistment of

men, or the fitting out, or arming of any vessel, for any such purpose, by any person within our jurisdiction.

It cannot be doubted that these laws are in conformity with the settled policy of our government. Very early in our history as a nation, this policy was adopted by President Washington, with the concurrence of the wise and eminent advisers by whom he was then assisted. On the 22d day of April, 1793, he issued a proclamation, in which he asserts it to be both the duty and interest of the United States, with sincerity and good faith, to pursue a conduct friendly and impartial towards the foreign powers therein mentioned, exhorting and warning the citizens of the United States carefully to avoid all acts inconsistent with such friendly and impartial conduct, and declaring that whoever should do otherwise, would not receive the protection of the United States. At this time, congress had not legislated on this subject. And in the following December, the president made known to both houses certain facts connected with the then state of public affairs abroad and at home, and after expressing his own opinion, that where individuals shall, within the United States, enter upon military expeditions and enterprises, the offence cannot receive too early or close an attention, he distinctly recommends to congress the extension of the statute law of the country to such cases, which, he says, though depending on principles already recognized, seemed to him to demand some further provisions of positive law. And, accordingly, on the 5th of June, 1794 (1 Stat. 381), an act was passed, one section of which was similar to the law whose substance I have already stated to you. And since that time, by legislation, as well as by the official action of the executive, this duty and policy of our country have been recognized and declared in the clearest terms, and under a great variety of circumstances. The principles on which these laws rest are, that until our country has made war, we are at peace with all, by the law of nature, and without any treaty to that effect; that for the citizens of the United States to combine to kill and rob those with whom they are at peace, and on whom they have no right to make any aggression, is as essentially criminal, as to combine to murder and rob our own citizens; that individual citizens have no prerogative to judge and condemn, and then proceed to execute others, or inflict on them any injury as a consequence of what may be assumed to be their misconduct; that the duties of impartiality, kindness, and peaceful treatment of other nations being plainly incumbent on the government of the United States, it is as plainly its duty to take care that all those subject to its authority, do nothing in contravention of those duties; what it may not do, in these particulars, it may not permit to be done; and that, for its own peace and welfare, and from its own sense of what is due to others, it cannot suffer individuals, by mingling themselves in the belligerent operations of other nations, or making war on their own authority, to run the hazard of counteracting the policy, or embroiling the relations of their government.

It may be added, that the United States was the first of all civilized nations to embody these principles in their municipal law, and enforce them by penal enactments. Having so legislated, it has become the clear duty of the courts of the United States to take cognizance of these offences, and it is to be expected that they will discharge with fidelity and firmness a duty so important to their country and to the peace of the world.

Under the laws of the United States, the highest of all crimes is treason. It must be so in every civilized state: not only because the first duty of a state is self-preservation, but because this crime naturally leads to and in-

volves many other, destructive of the safety of individuals and of the peace and welfare of society. This crime is defined by the constitution itself, and its magnitude, as well as the importance of a fit and rigid definition of it, may be inferred from the fact that it is the only offence defined by that instrument. It is there made to consist in levying war against the United States, or adhering to their enemies, giving them aid and comfort. This language is borrowed from an ancient English statute, enacted in the year 1352 (25 Edw. III.), mainly for the purpose of restraining the power of the crown to oppress the subject by arbitrary constructions of the law of treason. At the time of the introduction of this language into our constitution, it had acquired a settled meaning, and that meaning has been adopted by the courts of the United States when they have had occasion, as unfortunately they have had occasion, to interpret these words. This settled interpretation is, that the words "levying war," include not only the act of making war for the purpose of entirely overturning the government, but also any combination forcibly to oppose the execution of any public law of the United States, if accompanied or followed by an act of forcible opposition to such law in pursuance of such combination. The following elements, therefore, constitute this offence: (1) A combination, or conspiracy, by which different individuals are united in one common purpose. (2) This purpose being to prevent the execution of some public law of the United States by force. (3) The actual use of force, by such combination, to prevent the execution of that law.

These elements require some further explanation, to prevent their true nature from being misunderstood. It is not enough that the purpose of the combination is to oppose the execution of a law in some particular case, and in that only. If a person against whom process has issued from a court of the United States, should assemble and arm his friends forcibly to prevent an arrest, and in pursuance of such design, resistance should be made by those thus assembled, they would be guilty of a very high crime, but it would not be treason, if their combination had reference solely to that case. But if process of arrest issue under a law of the United States, and individuals assemble, forcibly to prevent an arrest under such process, pursuant to a design to prevent any person from being arrested under that law, and with such intent, force is used by them for that purpose, they are guilty of treason. The law does not distinguish between a purpose to prevent the execution of one, or several, or all laws. Indeed, such a distinction would be found impracticable, if it were attempted. If this crime could not be committed by forcibly resisting one law, how many laws should be thus resisted to constitute it? Should it be two, or three, or what particular number short of all? And if all, how easy would it be for the worst of treasons to escape punishment, simply by excepting out of the treasonable design, some one law. So that a combination formed to oppose the execution of a law by force, with the design of acting in any case which may occur, and be within the reach of such combination, is a treasonable conspiracy, and constitutes one of the elements of this crime. Such a conspiracy may be formed before the individuals assemble to act, and they may come together to act pursuant to it: or it may be formed when they have assembled, and immediately before they act. The time is not essential. All that is necessary is, that being assembled, they should act in forcible opposition to a law of the United States, pursuant to a common design to prevent the execution of that law, in any case within their reach. Actual force must be used. But what amounts to the use of force, depends much upon the nature of the

enterprise, and the circumstances of the case. It is not necessary that there should be any military array, or weapons, nor that any personal injury should be inflicted on the officers of the law. If a hostile army should surround a body of troops of the United States, and the latter should lay down their arms and submit, it cannot be doubted that it would constitute an overt act of levying war, though no shot was fired or blow struck. The presence of numbers who manifest an intent to use force, if found requisite to obtain their demands, may compel submission to that force, which is present and ready to inflict injury, and which may thus be effectually used to oppose the execution of the law. But, unfortunately, it will not often be necessary to apply this principle, since actual violence, and even murder, are the natural and almost inseparable attendants of this great crime. It should be known also, that treason may be committed by those not personally present at the immediate scene of violence. If a body of men be actually assembled to effect by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered guilty of treason.

Influential persons cannot form associations to resist the law by violence, excite the passions of ignorant and unreflecting, or desperate men, incite them to action, supply them with weapons, and then retire and await in safety the result of the violence which they themselves have caused. To permit this, would not only be inconsistent with sound policy, but with a due regard to the just responsibilities of men. The law does not permit it. They who have the wickedness to plan and incite and aid, and who perform any part however minute, are justly deemed guilty of this offence, though they are not present at the immediate scene of violence.

The court deeply regrets that it should ever be necessary in this country, and under this government, to instruct a grand-jury concerning the law of treason. But unfortunately, recent events have shown, too clearly, that there is a great misapprehension in some minds concerning this subject, and that it has already become necessary elsewhere, to institute inquiries and make presentments of this offence. With the temper of any portion of the public mind, so far as it manifests itself in discussion of any question, or the formation of opinions, or so far as it affects the political affairs of the country, this tribunal has no concern. But when it connects itself with the criminal law of the United States, when discussion passes into direct and urgent incitement to crime, when ignorant men are stirred up to form combinations to resist the law by violence, it becomes the duty of this court to apprise you of the true character of these combinations, and the acts which grow out of them, and the responsibility which the law attaches thereto.

I hardly need inform you that it is not material what law of the United States is thus resisted. We can know no distinction between one law of the United States and another. If it were permitted to you, or to me, to be influenced by our own wishes, in determining what laws should be executed, and what might be resisted with impunity, we should live no longer under a government of laws, but under a government of men; the transitory opinions and feelings of men, being substituted for a known and stable rule of action, operating at all times, and operating equally on all; and the citizen would be held innocent or guilty, not according to his wilful violation of a known rule, but according to the caprice of his judges. This is not the nature of the government under which we live. No such government could long exist in this country, or ought to exist in any country.